Filed 10/28/14  In re K.J. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br>        Plaintiff and Respondent, <br><br> v. <br><br> S.H., <br><br>        Defendant and Appellant. | A141085 <br><br> (Mendocino County Super. Ct. No. SCUKJVSQ 13-1622403) |

        S.H., the mother of K.J., challenges orders of the juvenile court denying her further reunification services, denying placement of her daughter with the maternal grandmother, and terminating parental rights.  Mother, the Mendocino County Health and Human Services Agency (county), the child, K.J., and other interested parties all presented significant amounts of conflicting evidence concerning what outcomes would be in K.J.'s best interests.  The juvenile court carefully evaluated the record and understood the complexities of the case before it.  Its rulings as to K.J. were supported by record evidence and were not an abuse of discretion.  We therefore affirm.

**BACKGROUND**

        In April 2011, the county filed a dependency petition alleging jurisdiction over K.J., then six months old, and her half brother J.H., then age 13.  As later found true by

1

the juvenile court, the siblings' mother, S.H., had been arrested for use of a controlled substance and child endangerment. She admitted to periodic and long-standing use of methamphetamine. K.J.'s father, meanwhile, had been arrested for injuring a spouse and violating a domestic violence court order. During this incident, which was one of a dozen or so reported incidents in the preceding two years, K.J.'s forehead was injured. As a result of the arrests, both of K.J.'s parents were incarcerated and unable to support her. Although there had not been a prior dependency case involving this family, there had been 11 previous referrals, many involving allegations of drug use and domestic violence.

Upon filing of the petition, the children were first placed, briefly, in shelter care and then with the maternal grandparents. At a disposition hearing, the court approved continued placement with the grandparents and ordered reunification services for the mother.

After six months of services, mother made excellent progress. She had six months' documented sobriety, participated in a myriad of treatment and counseling programs, and developed techniques for dealing with father's outbursts. She also had successful visits with K.J. and J.H., and those visits expanded to many times per week and to overnight visits. As a result of this progress, the juvenile court, in November 2011, placed both K.J. and J.H. with their mother and ordered family maintenance services.

In March 2012, the county filed a Welfare and Institutions Code[1] section 387 petition asserting placement with mother with family maintenance services was no longer effective. Mother had relapsed and used methamphetamine, which the county discovered after mother missed sessions of court-ordered services, including drug court. It was later learned mother, in February 2012, had been arrested for driving under the influence of

---

[1] Further statutory references are to the Welfare and Institutions Code unless noted.

2

methamphetamine and, during the arrest, gave a urine sample that tested positive for methamphetamine.

The juvenile court found the amended allegations of the section 387 petition true, and K.J. and J.H. were sent back to the maternal grandparents' home pending disposition of the petition.

After mother's early 2012 relapse was discovered, she re-engaged with rehabilitation services "harder than ever," remained drug free, and resumed daily, and eventually overnight, visits with her children. Thus, at the June 2012 disposition hearing, the juvenile court adopted the county's recommendation and returned K.J. and J.H. to their mother, with family maintenance services. Due to the father's ongoing drug use and threatening behavior with mother, however, the juvenile court, shortly thereafter, terminated father's reunification services. Later, at a status review in November, the juvenile court praised mother's continued progress, but ordered that maintenance services continue given mother's long struggle with narcotics and the risk of relapse.

As the next status review in May 2013 approached, mother was still testing negative for drugs and managing to balance her children's needs with work and classes. She had graduated from drug court in February 2013. The county submitted a recommendation to the court that the case as regards K.J. and J.H. be dismissed.

However, just before the status review hearing, mother relapsed again. In early May, she twice tested positive for methamphetamine and missed a third test. Also, in April, mother had agreed to provide a urine sample for testing, but then was unable to produce a sample when she realized a different, more tamper-resistant collection method was to be used. This raised concerns about tampering, and cast some doubt on the negative test results obtained to date. In the meantime, since mother's graduation from drug court, the county had received anonymous reports of mother using methamphetamine.

Based on mother's positive tests and refusal to test, the county filed a second petition under section 387 on May 15. Given the two prior drug-related detentions, the two years of drug treatment services, and the six months of reunification services already

3

provided, the county recommended out-of-home care for the children. The juvenile court ordered immediate detention and ultimately found the allegations of the section 387 petition true.

The maternal grandmother agreed to take J.H. once more, but declined to take K.J., telling the county she lacked the energy required for what was then a two-and-a-half-year-old child. K.J. was thus placed directly with foster parents, who happened to know and have a relationship with the maternal grandmother.

While the second section 387 petition was pending disposition, mother refused drug testing on May 22, May 28, June 3, and June 6, even when it was made clear to her refusals to test would be considered as positive tests. Mother, during a supervised visit with K.J., acknowledged the missed tests, and confessed to county staff that she was "under" and wanted residential treatment. When a social worker later spoke with mother about a new referral to the Alcohol and Other Drug Program, mother said, "You can stick the . . . referral up your butt because I'm not going." Mother also had contact with K.J.'s father, who threatened her and stole her cell phone. She did not report the incident for a week.

At the July 2013 disposition hearing on the 387 petition, the juvenile court heard evidence and argument. Stressing the need for permanence with a child under three years and having concerns about mother's repeated failures to control her drug addiction, the court denied further services to mother, citing section 361.5, subdivision (b)(13) regarding parents with extensive and repetitive addiction issues.[2]

At this point, the county sought to have a section 366.26 hearing to terminate mother's parental rights to K.J. and to have K.J. adopted by the foster parents who had

---

[2] Services need not be provided when "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible." (§ 361.5, subd. (b)(13).)

cared for her since May. Mother opposed termination of her rights. She also filed two section 388 petitions seeking changes to the juvenile court's previous orders. One petition sought further reunification services as to K.J., given that mother had recently enrolled in a residential drug treatment program and given the bonding study's conclusion that severing the parental relationship would be harmful to K.J. The other petition sought placement of K.J. with K.J.'s maternal grandmother instead of the foster parents. Mother asserted grandmother had changed her mind and was willing to care for K.J., and placement with grandmother would enable K.J. to maintain her valuable bond to her mother and half brother J.H.

The juvenile court addressed the section 388 petitions and termination of rights in one omnibus hearing on January 7 through 9, 2014.

The following reports and testimony were presented:

The county, in its section 366.26 report, stated mother had weekly visits with K.J. through July, August, and September, missing two of these. The visits were appropriate and K.J. was sad for the rest of the day when these visits were over. K.J. also visited mother's grandmother once a week for three hours. K.J.'s half brother J.H. joined these visits when he was able. On October 24, however, mother was prevented from meeting with K.J. after she tested positive, once more, for methamphetamine just before the scheduled meeting. Mother tested positive again on October 30. Mother's positive tests were particularly concerning to the county given that she knew these tests were the gateway to visits with K.J., yet still she could not control her use. Also of concern to the county was evidence mother and K.J.'s father were actually still in a relationship of sorts despite the couple's long-standing domestic violence issues, which had supposedly been addressed through services earlier in the case, in addition to the couple's pattern of drug abuse. Meanwhile, the foster parents were meeting K.J.'s physical, medical, emotional and educational needs since her most recent removal from mother on May 16, 2013.

The county also submitted a report from a state adoptions specialist who evaluated the maternal grandmother's home. The worker recounted grandmother's reluctance to adopt, a reluctance she did not abandon in full until December 30, 2013, when she herself

5

finally requested adoption from the county just days before the hearing on mother's long-pending section 388 petition.[3] The worker also recounted grandmother's troubles in the past raising her own children. The worker concluded K.J. should remain with her current caretakers, stating "removal from her current caregiver family would be seriously detrimental to her well being," noting K.J.'s substantial emotional ties to the foster parents and their children.

Mother submitted a bonding study from Gloria Speicher, Ph.D., who spent time with key family members and reviewed relevant case files. She observed positive, affectionate interactions between K.J. and mother. She heard K.J. tell mother that mother was the "real mom" and K.J. wanted mother to attend her upcoming birthday party. K.J. was sad when mother had to leave. Dr. Speicher concluded the several periods of K.J. living outside of mother's care were counterbalanced by frequent, positive visits with mother. K.J. was "very clearly strongly attached to her mother and exhibit[ed] a secure bond." Dr. Speicher opined K.J. would be "greatly harmed and suffer long term detriment to her mental health and well-being if the parent/child relationship were terminated" and that the benefits of maintaining the relationship outweighed the benefits of adoption.

Dr. Speicher also addressed K.J.'s bonds to her half brother J.H. They were at ease with each other. K.J. would notice when J.H was gone and sought to maintain a level of proximity. She was not clingy. J.H. was protective and engaged during visits. Dr. Speicher concluded the siblings were "very attached," having spent considerable time living together and having many shared experiences. She believed even if K.J. and J.H. could visit one another, if they could not grow up together in the same home, that would be detrimental to each of them. She believed the benefit to K.J. from growing up with her brother outweighed any benefits of adoption.

---

[3] The maternal grandparents also filed a request for de facto parent status on January 4, 2014.

The county submitted a bonding study from Jacqueline Singer, Ph.D., which reached different conclusions. Although Dr. Singer acknowledged mother's strong desire to raise K.J. and love for K.J., Dr. Singer observed a number of challenges. First, mother continued to struggle with drug use, which was causing her to miss visits with K.J. K.J. was becoming less sad at the end of each visit with mother and did not appear to be "pining" for her mother. K.J. began referring to mother by her first name and called her foster mother "mommy," though it also appears K.J. did the opposite during some interactions with mother. Dr. Singer was concerned K.J. had been apart from mother during crucial times in her development, from 6 to 12 months and from 18 to 21 months. K.J. would talk about her grandmother more than her mother when at the foster home. In short, K.J. appeared to be detaching from mother in favor of the foster parents and having confusion about continued contact with mother. Given this, given K.J.'s critical age, and given mother's significant, unresolved issues with drugs and domestic violence, Dr. Singer opined adoption, which offered far greater stability, was the better option for K.J.

As to K.J.'s relationship with her half brother, Dr. Singer concluded the permanence of adoption was more important and outweighed the limited nature of the siblings' ongoing relationship. The siblings had lived together for much of K.J.'s life, but given the large, 13-year age gap, their experience could not be categorized as "common." J.H.'s interactions with K.J. were playful, but J.H. was not fulfilling a caretaker or companion role. K.J. would not ask about her brother while with her foster family, though she would ask about him when at her grandmother's house. Finally, J.H.'s own issues with drugs, misbehavior, and early sexual encounters were not complexities to which K.J. needed exposure.

Mother, having entered a residential drug treatment program, submitted a letter from the program's supervisor suggesting patients such as mother could become quite successful in their lives after successfully completing the sort of 90-day residential program in which mother was participating.

At the hearing, Drs. Singer and Speicher generally testified in accord with their reports. Dr. Speicher did express concern about mother's most recent relapse and viewed

7

methamphetamine abuse as a "huge issue." But she viewed continuity with mother and J.H. as a surpassing benefit and disagreed K.J. was "detaching" from mother.

The maternal grandmother testified she had been mad at mother and had declined to take K.J. back in May to teach mother a lesson, not because she was unable to care for K.J. Health had been an excuse. Now, however, the grandparents wanted to adopt and testified, despite some depression, minor arthritis, and a "touch of asthma," they were able.

Finally, mother testified about making progress in her residential treatment program, a program she viewed as transformative. She conceded past indiscretions, but very much wanted to remain a parent to K.J. and for K.J. to remain in the family. She wanted to get K.J. back in her care "some day."

After considering all this evidence, the juvenile court ruled as follows:

It denied the section 388 petition for further reunification services. It concluded mother had neither shown changed circumstances nor that further services, and further delay, would be in K.J.'s best interest. Mother's re-engaging with drug treatment services might constitute "changing" circumstances, but not changed circumstances. Moreover, mother's history suggested that although she could successfully utilize services, she could not maintain extended sobriety afterward in a manner that would provide a safe home for a three-year-old child.

The court next denied the section 388 petition for placement with grandmother. It acknowledged the grandmother's significant role in raising K.J. and her probable ability to continue in that role. Yet, grandmother had, for whatever reason, declined to take K.J. into her home back in May at the last detention hearing. As a result, K.J. was placed with what was indisputably an excellent foster home. K.J. now looks to the foster parents for care and refers to them as her mom and dad. The juvenile court explicitly credited the evidence that disrupting K.J. from this positive environment would be detrimental.

The court, about a month later, followed up with an eight-page written order regarding termination of mother's parental rights under section 366.26. It found termination appropriate. It rejected the exception based on a parent's beneficial

8

relationship with the child. (See § 366.26, subd. (c)(1)(B)(i).) It again recognized the positive aspects of mother's involvement in K.J.'s life to date. Yet, when it came time to balance these positive aspects against mother's unresolved issues and K.J.'s need for permanence, the court acknowledged the competing views of Dr. Speicher and Dr. Singer, and found Dr. Singer's testimony supporting adoption more convincing. The court also rejected the exception to adoption based on K.J.'s relationship with her half brother J.H., age 17½ at the time of the hearing. Again, the court found Dr. Singer's analysis more convincing, agreeing that the benefits of the sibling relationship did not outweigh the benefits of adoption. The court pointed to the siblings' age difference, a lack of a common perception of their shared experiences, K.J. not asking for her brother while in the foster home, the availability of other siblings in the foster home, and the great likelihood that K.J. would continue to have J.H. in her life given the relationship between the foster parents and the grandmother.

Mother filed a notice of appeal from the written order, and all parties agree the notice is sufficient to challenge the rulings on the section 388 petitions. (See *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450.)

## DISCUSSION

### Section 388 Petitions

Under section 388, a parent may petition to change or set aside a prior family court order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1); see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) "A party moving to change a court order under section 388 cannot simply rely on 'new evidence,' which may often arise merely with the passage of time. The moving party must also show that the change in the court order will be in the best interest of the minor." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1094.)

The ruling on a section 388 petition is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295,

9

318.)  "Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts."  (*In re D.B.*, *supra*, 217 Cal.App.4th at pp. 1088–1089.)

As to her first section 388 petition, mother contends she presented evidence of changed circumstances sufficient to support further reunification services.  She cited her new, ongoing, and so-far-successful participation in residential drug treatment as proof that placement with her would be in K.J.'s best interest.  But whether mother presented sufficient evidence supporting placement with mother is not, despite the assertion of mother's counsel, the relevant question on appeal.  The relevant question, as just explained, is whether the juvenile court abused its discretion.

It did not.  First, it was reasonable for the juvenile court to conclude mother's circumstances had not sufficiently changed because she was currently in a new treatment program.  Mother had not successfully completed the program or demonstrated an ability to succeed outside of it.  (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 ["A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests"]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)  Moreover, the juvenile court carefully considered the conflicting evidence before it, including the reports and testimony of Drs. Singer and Speicher, and reasonably determined it would not be in K.J.'s best interests for her to endure the wait to see whether mother, after she had already obtained over two years of services, would succeed or fail at further reunification services upon return from her latest treatment.  (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 617, 620–621 [juvenile court did not err, in ruling on section 388 petition, by crediting evidence that one placement, paternal grandparents, would promote stability over evidence another placement, maternal grandfather, involved the child's then most substantial bond]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464 ["After the termination of reunification services, a parent's interest in the care, custody

10

and companionship of the child is no longer paramount. . . . Rather, at this point, the focus shifts to the needs of the child for permanency and stability"].)

As to the denial of the second section 388 petition, seeking placement with the maternal grandmother, mother similarly has not demonstrated an abuse of discretion by the juvenile court. Evidence from the state adoption specialist provided reasonable support for the court's conclusion, reached after careful consideration of all the evidence, that removing K.J. from her positive foster environment at a critical developmental stage was not in her best interests and could be detrimental. While Dr. Singer agreed, on cross-examination, that grandmother once provided positive care and Dr. Singer was unaware of a reason K.J. could not successfully transition back into that care, that does not invalidate the conclusion of the adoption specialist that disruption of the ever-increasing stability of the foster care placement would be detrimental, nor does it necessarily undermine Dr. Singer's own similar conclusions related to K.J.'s need for permanence and stability. In this post-reunification-services case, the juvenile court could reasonably conclude the family's late interest in having young K.J. placed with grandmother should not override K.J.'s interest in stability. (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 [even if relative placement is, at some points of a dependency proceeding, to be preferred, the passage of time in a successful placement promotes stability for a child and can undermine a late-expressed preference; the paramount consideration is always the best interests of the child].) After all the upheaval K.J. had endured to date, we cannot say the juvenile court acted unreasonably in choosing to keep K.J. in a placement that was working.

*Termination of Parental Rights*

The section 388 petitions aside, mother asserts the juvenile court erred in terminating her parental rights to K.J. under section 366.26 because there was a sufficiently beneficial parent-child relationship and a sufficiently beneficial sibling relationship.

11

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. The purpose is to protect the child's "compelling rights" to a stable, permanent placement founded upon a strong emotional commitment from a caretaker. (*In re D.M.* (2012) 205 Cal.App.4th 283, 289.) " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. . . . If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).' " (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1165.) When, as here, reunification services have ceased, "the focus of the proceedings changes from family reunification to the child's interest in permanence and stability." (*Id.* at p. 1163.)

An exception to termination of parental rights applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances," including "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subds. (c)(1)(B)(i), (v).)

It is not enough to convince a juvenile court that a beneficial parent or sibling relationship exists. "[E]ven if adoption would interfere with [such a] relationship, the court must nevertheless weigh the benefit to the child of continuing the . . . relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 61 [sibling relationship exception];

12

*In re C.B.* (2010) 190 Cal.App.4th 102, 124 [parental relationship exception, same]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 [parent must show "the child would benefit from continuing the relationship"].)

In reviewing a juvenile court's decision as to the applicability of the parental and sibling relationship exceptions, we employ the substantial evidence or abuse of discretion standards of review as appropriate. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.) We review factual determinations, such as the existence of a beneficial relationship, for substantial evidence. (*In re Bailey J., supra,* at p. 1314.) However, a juvenile court's determination of questions, such as whether, given the existence of a beneficial relationship, there is a compelling reason for determining termination of parental rights would be detrimental to the child, is a quintessentially discretionary determination. (*Id.* at p. 1315.) We review such decisions for abuse of discretion. (*Ibid.*) In the dependency context, both standards call for a high degree of appellate court deference. (*Ibid.*; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We note a difference of opinion regarding the applicable standard, with some courts applying either the substantial evidence or abuse of discretion standard, or a combination. (See *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621–622.) We find little practical difference in these circumstances. (See *In re Bailey J.*, *supra*, 89 Cal.App.4th at pp. 1314–1315.)

The standard of review compels affirmance in this case.

As to the parental relationship, the juvenile court recognized K.J. and her mother had enjoyed a positive relationship but concluded K.J.'s long-term needs were best served by adoption, and termination of mother's parental rights would not harm K.J. but actually improve her situation. This is a rational conclusion in light of the evidence before the court, which included evidence of mother's ongoing struggles with drugs and domestic violence and Dr. Singer's testimony that stability through adoption was essential to K.J.'s long-term well-being, given her formative age and that she was forging a strong attachment to her foster parents and detaching from mother. (See *In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 644 ["The parents demonstrated . . . a warm

13

and affectionate relationship with their son" but "they continue to abuse alcohol and each other" and so "have not demonstrated an ability to provide Marcelo, over the long term, with a stable, safe and loving home environment. Accordingly, the juvenile court properly found there was no beneficial parental relationship sufficient to overcome the statutory preference for adoption"]; see *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1166 ["mother was only at the beginning stages of working on the effects of domestic violence in her life, and there was still instability and dysfunction surrounding her relationship with father. By contrast, the children were in a secure placement and were bonded with their current and prospective caregivers"]; cf. *In re S.B.* (2008) 164 Cal.App.4th 289, 298 [termination might be inappropriate when no evidence of harm to child from continuing parental relationship and when parent complied with every aspect of case plan].)

That Dr. Speicher offered a conflicting view of K.J.'s best interests does not mean the juvenile court, which explicitly weighed the two doctors' testimony, erred. In resolving the permanency question, as discussed above in connection with the section 388 petitions, the juvenile court was free to credit one doctor's testimony over the other and our task is not to second guess that choice. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 708 [there was evidence mother had completed a treatment program, had a loving bond with her children, and return of the children would not pose a detriment, but "countervailing revelations in . . . various reports constituted substantial evidence of the risk of requisite detriment if the three children were returned to the mother"]; *In re Brian R.* (1991) 2 Cal.App.4th 904, 918–919 ["Appellant misunderstands the standard of review on this issue. Our function is not to reweigh the evidence and the conflicting expert testimony"].)

A similar analysis governs the sibling relationship exception. As required under section 366.26, subdivision (c)(1)(B)(v), the juvenile court considered the nature and extent of the relationship between K.J. and J.H. It rationally discounted the relationship's benefit to K.J. given the vast age difference between the children and rationally credited Dr. Singer's testimony that adoption better served K.J.'s needs. It also noted the prospective adoptive parents would allow for sibling contact. (*In re Megan S.* (2002)

14

104 Cal.App.4th 247, 254 [no substantial interference in sibling relationship when adoptive parents allow contact].)  The evidence supports the juvenile court's denial of the exception and we find no abuse of discretion.

### DISPOSITION

The orders of the juvenile court are affirmed.


_____
Banke, J.


We concur:


_____
Humes, P. J.


_____
Margulies, J.